## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KARA MILLER,

        *Plaintiff,*

vs.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

        *Defendant.*

Case No. 23-cv-2233-EFM

## MEMORANDUM AND ORDER

Plaintiff Kara Miller was employed by Defendant The Prudential Insurance Company of America for almost 14 years as an annuity wholesaler. She resigned in April of 2022 after being involuntarily transferred to a new sales channel. Plaintiff alleges that Defendant's decision to transfer her was discriminatory and resulted in her job elimination, demotion, and constructive discharge. She asserts three claims against Defendant: (1) sex discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) retaliation under Title VII; and (3) violation of the Equal Pay Act of 1963 ("EPA"). This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc. 58). For the following reasons, the Court grants in part and denies in part Defendant's Motion.

## I.      Factual and Procedural Background[1]

### A.      The Parties

Defendant is a financial services company headquartered in Newark, New Jersey, that sells annuities as part of its retirement services. Plaintiff is a Lenexa, Kansas, resident who worked for Defendant from July 2008 to April 1, 2022. For about the last ten years of her employment, Plaintiff held the position of Annuities External Wholesaler a/k/a Regional Vice President.

### B.      The Role of External Wholesalers

External wholesalers promote the sale of Defendant's annuity products to financial advisors, who in turn sell the products to their clients. External wholesalers work in an assigned sales channel and geographic territory. At all times relevant to this litigation, the designated sales channels included the independent broker-dealer channel ("IBD channel"), the bank/wire channel, and the more recently added regional markets channel ("RM channel"). Defendant launched the RM channel January 1, 2021. Plaintiff worked as an external wholesaler in the IBD channel from January 2012 until January 2022. Defendant transferred her to the RM channel effective January 1, 2022.

External wholesalers report to division sales managers ("DSMs"). From July 1, 2020, until her reassignment to the RM channel, Ted Repass was Plaintiff's DSM. When Plaintiff was reassigned to the RM channel, her DSM became Michael Schumacher.

External wholesalers are compensated through an annual base salary and commissions. The base salary is a small percentage of their compensation, with the large majority of their

---

[1] In accordance with summary judgment procedure, the Court has set forth the uncontroverted facts, unless noted otherwise, and they are related in the light most favorable to the non-moving party.

earnings coming from commissions. Every year, each external wholesaler is provided with a unique sales goal based on their sales channel and territory and a corresponding sales commission goal. The sales commission goal is often referred to as "target compensation" and represents the sales commissions the external wholesaler would earn if they met their annual sales goal. Sales goals and target compensation change year-to-year based on market conditions and other business factors. External wholesalers are not capped on the commissions they could earn, although practically, the size of their territory limits their potential earnings.

**C.    The Establishment of the RM Channel**

In 2020, amid unstable financial markets, Defendant began developing the RM channel to supplement the IBD and bank/wire channels. The strategy behind the RM channel was to capitalize on sales opportunities to smaller, regional financial firms, which Defendant refers to as Tier 3 and Tier 4 firms. At the same time, Defendant had pulled two of its products from the market and started selling a new product called "FlexGuard." Defendant believed there was a lower barrier entry for FlexGuard in the Tier 3 and Tier 4 firms than in the larger Tier 1 and Tier 2 firms (i.e, Morgan Stanley or LPL).

The working group charged with developing the RM channel included James Mullery, Defendant's Chief Sales and Distribution Officer; Burton Dietz, Vice President in the Planning and Analysis Sales Operation Group; Dietz's supervisor; and several other employees. Dietz used market data to determine which geographic areas would serve as the new territories within the RM channel and proposed an initial rollout of eight new territories covering a portion of the country. By November 2020, the RM channel was approved with implementation slated for January 1, 2021.

After creating the new geographic territories, Defendant began assigning external wholesalers from the IBD and bank/wire channels to the RM channel. Defendant did not prepare any contemporaneous documentation setting forth the criteria used to determine which external wholesalers were to be moved to the RM channel. Dietz testified that the external wholesaler's geographic location was an important factor because Defendant wanted to minimize disruption. In its position statement filed with the Equal Employment Opportunity Commission ("EEOC"), Defendant also stated that "performance" was a factor. Initially, four men and four women were assigned to the RM channel. Six of these external wholesalers came from the bank/wire channel; the remaining two were from the IBD channel. Plaintiff, an external wholesaler in the IBD channel, was not in the initial group of external wholesalers assigned to the RM channel.

Defendant provided compensation guarantees to external wholesalers transferred to the RM channel. These external wholesalers were guaranteed 100 percent of their target compensation for the first six months in the new channel and 50 percent of their target compensation for the next three months.

Defendant also imposed "protections" for external wholesalers remaining in the IBD and bank/wire channels who were already working with T3 and T4 firms. If any financial professional at a Tier 3 or Tier 4 firm achieved a minimum of $1 million of business in the previous 12 months, the external wholesaler in the IBD or bank/wire channel who was doing business with that firm would keep it as a client, and the external wholesaler in the RM channel would not be able to sell Defendant's products to it. In other words, that Tier 3 or Tier 4 firm was "protected" to the IBD or bank/wire external wholesaler.

**D.      Concerns Raised by an External Wholesaler as to the new RM Channel**

After being informed of her new RM channel assignment, one external wholesaler, Jen Nguyen, emailed a written complaint to Defendant's human resources department. She complained that this was the second time she was forced to give up her territory, and "[b]oth times were to white men." She wrote that her target compensation would also be less than the male colleague who was taking her former territory and clients. Nguyen also complained about taking on extra work of trying to track down protections, forcing her to comb through spreadsheets to determine which clients she can and cannot reach out to. She felt it was unfair for a protection to be extended to an entire office if only one of its financial advisors had over $1 million in business.

**E.      Plaintiff's Transfer to the RM Channel**

By June 2021, Defendant planned to expand the RM channel nationwide by adding six more territories. This resulted in the redrawing of territory lines to create fewer geographic territories in the IBD and bank/wire channels. On August 13, 2021, Human Resources Director Carrie Dare wrote to Amy Parsons, a manager in the Employee Relations group, stating that the upcoming expansion of the RM "will ultimately have a RIF [reduction in force] impact" and asking for disciplinary history of 10 employees, including Plaintiff. Parsons wrote back stating that no disciplinary actions existed against Plaintiff.

At some point, Defendant chose Plaintiff as one of the external wholesalers who would be moving to the RM channel when it expanded in January 2022. Prior to informing Plaintiff of her reassignment, Dietz, Donald Mallavia (Defendant's National Sales Manager), and Dare discussed via email the reductions in target compensation for Plaintiff and another external wholesaler because of the transfer. The managers noted that Plaintiff's target compensation would be $19,000 less year-over-year, and the other external wholesaler's loss would be $113,000 year-over-year.

In November or December 2021, Defendant informed Plaintiff that she was being transferred to the RM channel. At that time, Plaintiff was one of three external wholesalers in the IBD channel within her geographic territory. Plaintiff serviced Kansas, southern Nebraska, and western Missouri; Jared Montano serviced eastern Missouri and Illinois (excluding Chicago); and Ben Teeling serviced South Dakota and northern Nebraska. Jason Tanton was an external wholesaler in the bank/wire channel who serviced all of these locations except South Dakota.

Plaintiff's assignment in the RM channel was for the new central territory, which covered Kansas, Nebraska, Missouri, and Illinois (excluding Chicago). Teeling and Montano remained in the IBD channel, which was split into two new geographic territories: (1) the central plains territory consisting of Iowa, Nebraska, and Kansas (excluding Kansas City) and (2) St. Louis/ Kansas City territory consisting of Kansas City, all of Missouri, and Illinois (excluding Chicago). Tanton remained in the bank/wire channel and was assigned to the central territory consisting of Oklahoma, Arkansas, and Louisiana.

Just like the 2021 rollout of the RM channel, all external wholesalers assigned to the RM channel during the January 2022 expansion received a guarantee of 100 percent of their 2022 target compensation goal for the first six months of the year and 50 percent for the next six months of the year. Furthermore, external wholesalers in the RM channel were paid a commission rate of 0.5 percent, while external wholesalers in IBD and bank/wire channels were paid a commission rate of 0.4 percent.

Defendant does not have any contemporaneous documentation setting forth what criteria it used to pick Plaintiff for assignment to the RM channel. In its interrogatory response, Defendant states that it used the following criteria. First, Defendant looked to see if an external wholesaler resided in the same geographic territory as the new RM geographic territory. If multiple external

wholesalers resided in the geographic territory, then Defendant looked at their proximity to the center of the territory. And next, Defendant looked to existing relationships in the territory and/or experience in the IBD channel.

The center of Plaintiff's new geographic territory—the central territory—was Kansas City. Of the four external wholesalers mentioned above, Plaintiff and Tanton were the only ones who resided in the Kansas City metropolitan area. As to performance, Repass testified that he had no concerns with Plaintiff's performance. She had a good reputation, and her sales numbers were in line with others. He thought she was a good wholesaler, had very good relationships, was thorough, and "really cared about doing a good job. As for Tanton, Mallavia rated him as an "average" external wholesaler.

As an external wholesaler in the RM channel, Plaintiff could not bring her existing Tier 1 and Tier 2 clients with her. Instead, she was expected to give these clients to the new external wholesaler acquiring her territory in the IBD channel. According to Repass, external wholesalers in the RM channel were "to generate new business exclusively; thus, there were no protections for them." Plaintiff was also limited as to the Tier 3 and Tier 4 firms she could do business with. Based on Defendant's protections, if the Tier 3 or Tier 4 firm had one financial advisor that produced more than $1 million dollars, the external wholesaler in the IBD or bank/wire channel who was previously working with that firm would get to keep it. At some point, Plaintiff learned that Defendant was not systemically allocating these protections. Tanton received protections for Tier 3 and Tier 4 firms even though they did not meet the $1 million threshold because Tanton "had just developed that relationship" with them.

**F.     Plaintiff's Relationship with her Internal Business Partner**

The staffing for an external wholesaler includes an internal business partner and a scheduler. Plaintiff's internal business partner, J.N., lied to her on a regular basis and ignored her requests for scheduling and taking care of clients. When she was in the IBD channel, Plaintiff complained about J.N.'s lack of support to Repass and asked for a different internal to support her. However, internals reported to different management, and neither Plaintiff nor her managers had the ability to remove or reassign internals. J.N. received coaching sessions at least as early as June 2021 related to Plaintiff's complaints.

**G.     Plaintiff's Gender Discrimination Complaint and Resignation**

Shortly after her reassignment to the RM channel, Plaintiff was contacted by a recruiter from Symetra, and she interviewed for a position with that company in mid-February 2022. On March 4, Plaintiff received a job offer from Symetra with a start date of April 4, 2022.

Also on March 4, Plaintiff sent an internal complaint via email to Defendant's human resources department. Plaintiff alleged that her assignment to the RM channel was a discriminatory demotion based on her gender, that she believed assignments to the RM channel adversely affected long time female employees, and that she lacked support and was subjected to a hostile work environment due to performance related issues she had been experiencing with her internal business partner.

Plaintiff's complaint was escalated to Defendant's law department for further handling. The law department interviewed Plaintiff and other employees regarding Plaintiff's allegations. As to Plaintiff's hostile work environment complaint, Plaintiff's internal business partner received a written warning and was ultimately terminated. Defendant's investigation into Plaintiff's discrimination complaint found that her allegations were unsubstantiated.

Plaintiff resigned from Defendant on April 1, 2022. As of 2022, her base salary was $60,000, and her target compensation goal for 2022 was $247,188. By comparison, her target compensation goal for 2021 was $266,146. From January 2022, through the end of her employment in April 2022, Plaintiff earned $72,096.50 in commissions. Comparing Plaintiff to Tanton, Teeling, and Montano, Plaintiff's target compensation was higher than Tanton's, but less than Teeling's and Montano's. Both Tanton and Teeling earned less than Plaintiff in commissions between January and April of 2022. Montano earned more than twice what Plaintiff earned during that period. He had over $40,000,000 more annuities sales within his territory as compared to Plaintiff.

## H.    This Litigation

Plaintiff filed this lawsuit in May 2023. She asserts three claims: (1) sex discrimination and hostile work environment under Title VII; (2) retaliation under Title VII; and (3) violation of the EPA. Under Title VII, Plaintiff seeks over $3.5 million in the form of lost wages, punitive damages, emotional distress damages, front pay, attorneys' fees, and costs. Under the EPA, Plaintiff seeks over $3 million in lost wages, statutory interest, and attorneys' fees and costs. Defendant now moves for summary judgment on all of Plaintiff's claims.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered

---

[2] Fed. R. Civ. P. 56(a).

evidence permits a reasonable jury to decide the issue in either party's favor.[3]  The movant bears

the initial burden of proof and must show the lack of evidence on an essential element of the claim.[4]

If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must

instead "set forth specific facts" that would be admissible in evidence in the event of trial from

which a rational trier of fact could find for the nonmovant.[5] These facts must be clearly identified

through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone

cannot survive a motion for summary judgment.[6] The Court views all evidence and reasonable

inferences in the light most favorable to the party opposing summary judgment.[7]

### III.    Analysis

### A.    Sex Discrimination and Hostile Work Environment under Title VII

Title VII prohibits discrimination in the terms and conditions of employment based on sex.[8]

When a discrimination claim is based on circumstantial evidence, like Plaintiff's claim here, the

Court applies the familiar *McDonnell Douglas* burden-shifting framework.[9] First, the plaintiff

must prove a prima facie case of discrimination against the defendant.[10] The plaintiff establishes a

---

[3] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[5] *Id*. (citing Fed. R. Civ. P. 56(e)).

[6] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[7] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[8] 42 U.S.C. § 2000e-2(a)(1).

[9] *See Khalik v. United Airlines*, 671 F.3d 1188, 1192 (10th Cir. 2012) ("A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).").

[10] *Id*.

prima facie case by showing that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[11] If the plaintiff satisfies this burden, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse employment action.[12] If the defendant does so, the burden shifts back to the plaintiff to show that there are genuine issues of fact that the reasons Defendant offered were not the real reasons for the adverse employment action but instead were a pretext for sex discrimination.[13]

Plaintiff's sex discrimination claim is based on (1) the elimination of her position, (2) her assignment to the RM channel, and (3) constructive discharge. She also alleges a hostile work environment. Defendant seeks summary judgment on the basis that Plaintiff cannot establish a prima facie case as to any of these factual bases, and in any event, cannot establish pretext. Defendant also argues that Plaintiff has no evidence supporting her hostile work environment claim. The Court addresses each of Plaintiff's alleged factual bases for discrimination below.

### 1.    *Elimination of Plaintiff's Position*

Defendant first argues that it is entitled to summary judgment because Plaintiff cannot base her sex discrimination claim on the elimination of her position. According to Defendant, although the geographic territory Plaintiff serviced in the IBD channel was eliminated, her position was not. Defendant asserts that Plaintiff kept her role as an external wholesaler even when she was transferred to the RM channel, and thus her position was not eliminated. In response, Plaintiff

---

[11] *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (citing *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005)).

[12] *Id.* (citing *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006)).

[13] *Id.*

points to the deposition of Donald Mallavia, Defendant's National Sales Manager who was in charge of implementing the RM Channel. He testified that Plaintiff had no choice but to transfer to the RM channel because her position in the IBD channel was eliminated. This testimony creates a genuine issue of material fact as to whether Plaintiff's position was eliminated. Thus, the Court declines to grant summary judgment to Defendant on this basis.

### 2.    *Plaintiff's Assignment to the RM Channel*

Defendant next contends that Plaintiff cannot establish a prima facie case based on her assignment to the RM channel, and even if she did, she has no evidence that Defendant's reasons for assigning her to that channel are pretext. Because Defendant's arguments encompass all three stages of the *McDonell Douglas* framework, the Court will analyze Plaintiff's claim pursuant to those guidelines below.

#### a.    Prima Facie Case

##### i.    Adverse Employment Action

Defendant argues that Plaintiff cannot establish a prima facie case because her assignment to the RM channel is not an adverse employment action. Defendant argues that for Plaintiff's transfer to be considered adverse, she must be demoted. It contends that Plaintiff was not demoted because her base salary and her responsibilities and job function remained the same. Defendant further points out that Plaintiff, like every other external wholesaler assigned to the RM channel, received guaranteed commission compensation and higher commission basis points.

The Court, however, disagrees. A reassignment to a new position is considered a demotion when the employee shows that she "receives less pay, has less responsibility, or is required to

utilize a lesser degree of skill than [her] previous assignment."[14] Here Defendant claims that Plaintiff did not receive a reduction in pay when she was transferred to the RM channel because she received guaranteed compensation for the first six months. But, Plaintiff has produced email documentation and deposition testimony showing that her managers knew the transfer would result in a $19,000 year-over-year decrease in compensation.

Moreover, Defendant asks the Court to impose a higher standard than what is required in determining whether an employment action is adverse. In *Muldrow v. City of St. Louis, Missouri*,[15] the Supreme Court held that a plaintiff bringing a Title VII discrimination claim is no longer required to show that the harm incurred by the plaintiff is significant.[16] Instead, the plaintiff must only show that she suffered "some harm respecting an identifiable term or condition of employment."[17] Here, in addition to her loss in pay, Plaintiff lost all of her Tier 1 and Tier 2 clients, was required to form new business relationships with lower-tier, less prestigious clients, and was required to travel to farther geographic locations. This evidence is sufficient to show Plaintiff experienced a "disadvantageous change" in the terms and conditions of her employment.[18] Thus, the Court finds that Plaintiff has established that her assignment to the RM channel was an adverse employment action.

---

[14] *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993) (citation omitted), *overruled on other grounds by Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995)).

[15] 601 U.S. 346 (2024).

[16] *Id*. at 355 (citation omitted).

[17] *Id*. at 347.

[18] *Id*. at 354 (citation omitted).

ii.    Inference of Discrimination

The third element of Plaintiff's prima facie case requires her to show that "the challenged action took place under circumstances giving rise to an inference of discrimination."[19] Plaintiff's burden at this stage is "not onerous,"[20] and is shown by the "small amount of proof necessary to create [an inference of discrimination]."[21] Here, Defendant asserts it used the following "objective factors" in choosing which external wholesalers would transfer to the RM channel in both 2021 and 2022: (1) whether any of the external wholesalers lived in the new geographic territory; (2) if more than one lived in the territory, which external wholesalers lived closest to the geographic center of the territory; (3) what channel the external wholesaler serviced; and (4) the existing relationships in the territory to determine what assignment would be least disruptive to existing relationships. But, as Plaintiff points out, there is no contemporaneous documentation showing that Defendant actually used these factors. Furthermore, to the extent Defendant did use the factors, Plaintiff presents evidence that Defendant applied them in favor of her male comparators.[22] For example, Defendant argues that it chose Plaintiff to move to the RM channel instead of Tanton because Plaintiff was in the IBD channel and Tanton was in the bank/wire channel. But, the RM channel served both IBD and bank/wire firms, and in the first wave of transfers, six of the eight external wholesalers who were transferred were previously in the bank/wire channel. Plaintiff also presents evidence that Defendant applied its "protections" in favor of her male comparators.

---

[19] *PVNF*, 487 F.3d at 800 (citing *Sorbo*, 432 F.3d at 1173).

[20] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[21] *Id*. (quoting *EEOC v. Flasher Co. Inc*., 986 F.2d 1312, 1318 (10th Cir. 1992)).

[22] The Court more thoroughly discusses this evidence in the pretext section *supra*.

Tanton was given protections outside of Defendant's $1 million guideline for Tier 3 and Tier 4 firms solely because they were new relationships. Accordingly, the Court concludes that Plaintiff has met her burden to show that her transfer to the RM channel occurred under circumstances showing an inference of discrimination.[23] Plaintiff establishes a prima facie case.

       b.      Legitimate Non-Discriminatory Reason

Because Plaintiff demonstrates a prima facie case, the burden shifts to Defendant to set forth a legitimate, non-discriminatory reason for the adverse employment decision.[24] This burden is "exceedingly light."[25] Defendant contends that it developed the RM channel to access an untapped market and to help bring its FlexGuard product to market. Defendant further contends that Plaintiff was chosen to transfer to the RM channel based on the application of its "objective factors" for choosing which external wholesalers to move to the RM Channel. According to Defendant: Plaintiff lived in the geographic center of the new central territory; she was an experienced IBD external wholesaler; and many of the firms in the regional market channel were IBD firms. Defendant thus contends these factors dictated that Plaintiff be selected for the RM channel. The Court finds that this is a legitimate non-discriminatory reason for Plaintiff's transfer to the RM channel.

---

[23] Plaintiff also offers statistical evidence regarding the number of female external wholesalers moved to the RM channel versus the number of male external wholesalers moved to the RM channel and the email from Jen Nguyen complaining about her transfer to the RM channel in 2021 as evidence of discriminatory intent. Because the Court finds Plaintiff has met her burden without relying on this evidence, the Court will not address it here.

[24] *Khalik*, 671 F.3d at 1192.

[25] *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (quoting *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

c.    Pretext

Because Defendant has carried its burden, Plaintiff must show that there is a genuine issue of material fact as to whether Defendant's reasons were not the real reason for Plaintiff's assignment to the RM channel but were a pretext for discrimination.[26] "To show pretext, the plaintiff must establish that the employer's proffered reasons 'were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.'"[27] "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[28] Here, Plaintiff brings forth several reasons, taken together, from which a reasonable jury may discredit Defendant's explanation for moving Plaintiff to the RM channel.

First, as noted above, Defendant offers no contemporaneous documentation that it used its "objective factors" in choosing Plaintiff over her male comparators. When explaining why Plaintiff was chosen for transfer, Defendant only cites its interrogatory response and deposition testimony, both of which were provided in response to this lawsuit.[29] In its Position Statement filed with the EEOC, Defendant stated that performance was also an issue. But, on that measure, Repass stated that he had no concerns about any aspect of Plaintiff's performance. Thus, Defendant sets forth inconsistent reasons for its decision.

---

[26] *Khalik*, 671 F.3d at 1192.

[27] *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1216 (10th Cir. 2022) (quoting *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019)).

[28] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (brackets omitted) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

[29] *See Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 111 (10th Cir. 2009) (finding that a document prepared by the defendant employer in response to litigation "could surely cause a reasonable factfinder to view it with a degree of skepticism.").

Second, Defendant's deposition testimony raises questions as to how these factors were actually applied. For example, Repass testified that he did not know why Kansas City was chosen as the geographic center. Dietz had told him that all four external wholesalers living in the central territory (Plaintiff, Teeling, Tanton, and Montano) were being considered for transfer to the RM channel. And Mullery testified that DSMs played a decisive part in deciding which external wholesalers were transferred. Plaintiff's DSM, however, denied that he played any role in choosing Plaintiff.[30]

Third, Defendant claims that it picked Plaintiff over Tanton—who also lived in the Kansas City area—because Tanton served the bank/wire channel, and there were more IBD clients in the new central territory. But, Plaintiff kept very few of her existing Tier 3 and Tier 4 clients because of the protections Defendant gave to the IBD and bank/wire external wholesalers. Plaintiff's potential client base was even further limited by the fact that Tanton received protections for Tier 3 and Tier 4 firms beyond the $1 million threshold simply because Tanton's relationship with them was new.

Defendant's reasons for choosing Plaintiff to move instead of Tanton are further weakened by the fact that Mallavia's planning documents show that both IBD and bank/wire accounts would be covered in the RM channel. Additionally, while Defendant claims that an external wholesaler's service in the IBD channel is more important than service in the bank/wire channel, this ignores

---

[30] *See id.* at 112 (noting that a company's unwillingness to name any of the decision makers who made the decision to terminate the plaintiff casts a shadow of doubt about the employer's explanations*); see also Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (finding a genuine issue of material fact as to pretext where the managers made inconsistent statements as to who made the decision to terminate the plaintiff's employment).

the fact that in the first wave of transfers in 2021, six of the eight transferees were from the bank/wire channel.[31]

Taken together and viewed in the light most favorable to Plaintiff, this evidence shows that a reasonable jury could find Defendant's asserted reason for transferring Plaintiff unworthy of belief. Therefore, the Court denies summary judgment on Plaintiff's discrimination claim based on her transfer to the RM channel.

### 3.    *Constructive Discharge*

As part of her showing of an adverse employment action, Plaintiff alleges that Defendant constructively discharged her. To establish constructive discharge, a Title VII plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign."[32] A plaintiff's burden on this claim is "substantial."[33] The question is "whether the employee had any other reasonable choice but to resign in light of [the employer's] actions."[34]

In support of her constructive discharge claim, Plaintiff presents the following evidence: (1) her position in the IBD channel was eliminated and she had no choice but to transfer to the RM channel; (2) the transfer to the RM channel would result in a compensation loss of $19,000 year-over-year; (3) Plaintiff lost all of her Tier 1 and 2 clients and was forced to develop almost all new

---

[31] Defendant attempts to explain this inconsistency by arguing that in the first wave the external wholesalers from the bank/wire channel were chosen because there was a surplus of bank/wire external wholesalers due to Defendant removing two of its products from the market. The deposition testimony Defendant cites, however, does not fully support this explanation. Furthermore, Defendant does not list a surplus of bank/wire wholesalers as one of the factors it used in determining which external wholesalers were transferred to the RM channel, raising further questions as to how Defendant applied its factors in choosing Plaintiff.

[32] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1174 n.19 (10th Cir. 2007) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)).

[33] *PVNF*, 487 F.3d at 805 (citing *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir.2004)).

[34] *Ford*, 45 F.4th at 1235 (internal quotation marks and citations omitted).

clients; (4) the transfer increased her workload and travel time; (5) Plaintiff was humiliated and embarrassed when she learned that Tanton received protections for accounts less than $1 million, contrary to the guidelines Defendant applied; and (6) Plaintiff received almost no support from her internal even though she complained about him for years.

Plaintiff does not explain, and the evidence does not show, how her lack of support from her internal business partner is related to Defendant's allegedly discriminatory actions, and thus, this evidence does not support her constructive discharge claim. Nevertheless, the remaining evidence Plaintiff cites is sufficient for her claim to proceed on a constructive discharge basis. "A perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify [a] finding of constructive discharge."[35] Here, Plaintiff submits evidence that she received a $19,000 reduction in pay when she was transferred to the RM channel. This, along with the additional evidence noted above, creates a genuine issue of material fact as to whether she was constructively discharged.

Defendant argues that Plaintiff was not constructively discharged because within six weeks of her reassignment she pursued other job opportunities and resigned shortly thereafter. According to Defendant, this conduct undercuts any suggestion that she would have been compelled to resign. Timeliness is a factor a court may consider when analyzing a constructive discharge claim.[36] But, in the cases Defendant cites, the timeliness of the plaintiff's resignation is relevant when it is either

---

[35] *James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 993 (10th Cir. 1994) (citation omitted); *see also, e.g., Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 178 (10th Cir. 1986) (concluding that the plaintiff-employee had presented sufficient evidence of intolerable working conditions, and therefore a constructive discharge, to survive a directed verdict, based on evidence of a perceived demotion and reduction in salary).

[36] *See Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st. Cir. 1991)

immediate or unreasonably delayed.[37] Here, Plaintiff resigned three months after her transfer to

the RM channel, which meets neither of those descriptions. Furthermore, to the extent Defendant

claims that Plaintiff began to seek employment just six weeks after her transfer, this is contradicted

by evidence showing that Plaintiff did not seek out her new employment. A recruiter from Symetra

reached out to her. Therefore, the Court denies summary judgment to Defendant on this claim.

     *4.*     *Hostile Work Environment*

     Plaintiff also sets forth a hostile work environment as part of her discrimination claim under

Title VII. Defendant moves for summary judgment on this claim on the basis that she has no

evidence in support of it. Plaintiff does not respond to Defendant's arguments in her opposition

brief, and therefore she has abandoned this claim.[38] Accordingly, the Court grants summary

judgment to Defendant on Plaintiff's hostile work environment claim.

**B.**    **Retaliation**

     Plaintiff's Title VII retaliation claim is subject to the *McDonnell Douglas* burden-shifting

framework.[39] To establish a prima facie case, Plaintiff must show that (1) she engaged in protected

---

[37] None of the cases cited by Defendant are analogous to Plaintiff's resignation here. For example, in *Woodward v. City of Worland*, the court found that the plaintiff did not establish constructive discharge because she continued to work for a year and half without filing a complaint to her employer about her intolerable working conditions. 977 F.2d 1392, 1402 (10th Cir. 1992). Similarly, in *Hogue v. MQS Inspection*, the plaintiff continued to work for a year and a half without filing a complaint after the alleged incident that made her working conditions intolerable. 875 F. Supp. 714, 723-24 (D. Colo. 1995). The district court also found it significant that while he was working, the plaintiff did not look for employment elsewhere because he "was being treated fairly," and took a week and half to think about a job offer before he resigned. *Id*. at 723. In *Yearous v. Niobrara County Memorial Hospital By and Through Board of Trustees*, the Tenth Circuit found the timing of the Plaintiffs' resignation relevant when one plaintiff resigned less than a month and the other plaintiff resigned less than a week after working in the allegedly intolerable conditions. 128 F.3d 1351, 1357 (10th Cir. 1997), *cert denied*, 523 U.S. 1074 (1998).

[38] *See Escalante v. LifePoint Hosp. Inc.*, 2019 WL 2743910, at *5 (D. Kan. July 1, 2019) ("Plaintiffs do not respond to Defendant's argument in favor of summary judgment on this claim. Plaintiffs' lack of response to this argument is basis for summary judgment alone.") (citing *Hinsdale v. City of Liberal*, 19 F. App'x 749, 768-69 (10th Cir. 2001)).

[39] *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1135-36 (10th Cir. 2005).

opposition to discrimination; (2) she was subjected to an adverse employment action after voicing that opposition; and (3) a causal connection exists between the protected activity and the adverse action.[40] If Plaintiff establishes a prima facie case, then the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action.[41] If Defendant meets this burden, then Plaintiff must show that there is a genuine issue of fact as to whether Defendant's reason is pretextual.[42]

Here, Plaintiff engaged in one protected activity: on March 4, 2022, she made an HR complaint. Plaintiff contends that she was subject to a materially adverse employment action after she lodged this complaint because she was constructively discharged. But Plaintiff cannot establish a causal connection between her HR complaint and her resignation. The gravamen of Plaintiff's constructive discharge claim is that she was forced to transfer to the RM channel with a resulting loss in pay. Plaintiff's transfer occurred before she made her HR complaint. Thus, she cannot show that her constructive discharge resulted from her protected conduct. Plaintiff therefore fails to state a prima facie case of retaliation.

Plaintiff also argues that after she filed her HR complaint, Schumacher, her DSM in the RM channel, told her that she could have received the same protections as males if she "had said nice things about them and was a team player." This conversation alone, however, is not an adverse employment action. Plaintiff argues that it was "the straw that broke the camel's back" leading to

---

[40] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000); *Medina*, 413 F.3d at 1135-36.

[41] *Medina*, 413 F.3d at 1136.

[42] *Id*.

her resignation and relies on *Burrage v. United States*[43] to argue that this conversation is sufficient to establish but-for causation. *Burrage*, however, is irrelevant and inapplicable here. It involves an appeal of a criminal conviction for heroin distribution resulting in death, wherein the court analyzed the Controlled Substances Act and assessed the "but-for cause" of death.[44] Thus, Plaintiff has not shown that Schumacher's comments were an adverse employment action or that a causal connection exists between her discrimination complaint and those comments.

Accordingly, the Court grants summary judgment to Defendant on Plaintiff's retaliation claim under Title VII.

**C.    Equal Pay Act Claim**

The EPA prohibits pay discrimination based on sex.[45] The Act requires employers to pay their female and male employees who do equal work an equal "rate" of pay.[46] To establish a prima facie case, Plaintiff must demonstrate that "(1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) the male employees were paid more under such circumstances."[47] If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to justify the wage disparity based on one of four affirmative defenses: "[1] a seniority system; [2] a merit system; [3] a system

---

[43] 571 U.S. 204 (2014).

[44] *Id.* at 210-14.

[45] *Nzinitsky v. Integris Baptist Med. Ctr., Inc.*, 852 F. App'x 365, 367 (10th Cir. 2021) (citing 29 U.S.C. § 206(d)).

[46] 29 U.S.C. § 206(d)(1).

[47] *Nzinitsky*, 852 F. App'x at 367 (quoting *Riser v. QEP Energy*, 776 F.3d 1191, 1196 (10th Cir. 2015)).

which measures earning by quantity or quality of output; or [4] a differential based on any other factor other than sex."[48] "At the summary judgment stage, this means an employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary."[49]

Plaintiff's EPA claim is based on the period she was assigned to the RM channel. She argues that she was paid less than her male comparators—Tanton, Teeling, and Montano. Defendant seeks summary judgment on Plaintiff's claim on the basis that she cannot demonstrate a prima facie case as to Teeling and Tanton. As to Montano, Defendant argues that even if Plaintiff establishes a prima facie case, the pay disparity is justified because external wholesalers are paid on a commission-based system that measures earnings by quantity of output. In response, Plaintiff argues that Teeling, Tanton, and Montano's opportunity size was larger than hers, thereby limiting her earning potential. She also argues that her salary was temporally guaranteed because Defendant knew she would earn substantially less than before.

The Court agrees with Defendant that Plaintiff fails to state a prima facie case as to Tanton and Teeling. It is undisputed that they were paid less than Plaintiff from January to April of 2022. And while Plaintiff argues that Tanton and Teeling had greater earning potential, this is contradicted by the facts showing that Tanton had a lower target sales compensation in the bank/wire channel in 2022. Regardless, Plaintiff cannot premise her claim on future earnings—it must be based on what she and her comparators were paid.[50] Therefore, Plaintiff has no viable EPA claim as to Tanton or Teeling.

---

[48] *Id.* (quoting *Riser*, 776 F.3d at 1198).

[49] *Id.* (citation and internal quotation marks omitted).

[50] *See Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1467 (10th Cir. 1992) (stating that a violation of the EPA occurs when the discriminatory low wage is paid to the employee); *see also Fusco v. Ins. Planning Ctr.*, 2008 WL

As to Montano, Plaintiff's claim does not fare better. Although Montano earned more than Plaintiff from January to April of 2022, the difference in compensation was due to Defendant's commission-based compensation system. "The quantity test refers to equal dollar per unity compensation rates, and there is no discrimination if the employees receive the same pay rates, but one receives more compensation because he or she produces more."[51] Here, Defendant submits evidence that Plaintiff had a commission rate of 0.5 percent on variable products sold, while Montano had a commission rate of 0.4 percent.[52] In addition, Montano had $40 million more in annuities sales in his territory between January and March of 2022 than Plaintiff had in her territory in that time frame. In short, Montano out-produced Plaintiff. "There is no discrimination when one employee produces more and is therefore compensated more."[53]

Plaintiff does not offer any argument as to why Defendant's affirmative defense does not apply. Indeed, her sole argument is that Montano's opportunity size was much larger than hers, thereby limiting her earning potential. But, the EPA does not measure earning potential—it measures rates of pay.[54] And to the extent Plaintiff is alleging that Defendant reduced her earning potential by moving her to the RM channel, this allegation goes to her discrimination claim, not

---

11442032, at *11 (D. Kan. Apr. 30, 2008) ("The court must now consider if the male employees *were paid* more than the female employees." (emphasis added)).

[51] *Fusco*, 2008 WL 11442032, at *11.

[52] *See id.* (explaining that "[t]he plaintiff has not established that she was paid less then [sic] the men in similar jobs. In fact, in some respects, she was paid at a higher commission rate than other men performing equal work.").

[53] *Id*. at *12.

[54] 29 U.S.C. § 206(d)(1).

her EPA claim. Therefore, the Court grants summary judgment to Defendant on Plaintiff's EPA claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 58) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 1st day of May, 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE